## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

DANA F.,
o/b/o O.E.H.,

                          Plaintiff,

        v.                                   6:18-CV-1337
                                            (ATB)

NANCY A. BERRYHILL,[1]

                          Defendant.

---

ELIZABETH V. KRUPAR, ESQ., for Plaintiff
LUCY WEILBRENNER, SPECIAL ASS'T. U.S. ATTORNEY, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") benefits on behalf of her son, O.E.H.,[2] on August 3, 2015.  (Administrative Transcript ("T.") at 11, 96, 105).  The application was initially denied on November 18, 2015, and plaintiff made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T.

---

[1]Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. The Clerk of Court is respectfully directed to amend the caption to reflect the proper defendant.

[2]Throughout this decision, the child on whose behalf this action was brought will be generally referred to as "the claimant" or by his initials, "O.E.H."  Dana F., who commenced this action on behalf of her son, will generally be referred to as "plaintiff" or "O.E.H.'s mother."

11, 106, 111). The hearing, at which O.E.H. and plaintiff appeared without representation, was conducted by ALJ John Ramos on July 13, 2017. (T. 11, 79-95).

On December 4, 2017, the ALJ issued a decision finding that O.E.H. was not disabled from the date of the application through the date of his decision. (T. 8-30). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on September 28, 2018. (T. 1-7).

## II.    ISSUES IN CONTENTION

Plaintiff makes the following arguments:

(1)    The ALJ failed to develop a full and fair record. (Plaintiff's Brief ("Pl.'s Br.") at 10-15; Dkt. No. 9).

(2)    The ALJ improperly weighed the medical evidence. (Pl.'s Br. at 15-20).

(3)    The ALJ erred in finding that the plaintiff's testimony was inconsistent with the evidence of record. (Pl.'s Br. at 20-24).

Defendant argues that the ALJ's failure to develop the record was harmless error, and the ALJ otherwise properly evaluated the evidence. (Defendant's Brief ("Def.'s Br.") at 5-16; Dkt. No. 11). For the reasons stated below, the court concludes that the ALJ erred and that the case should be remanded for further administrative proceedings in developing the record and evaluating the medical opinion evidence.

## III.    FACTUAL OVERVIEW

Plaintiff's counsel has carefully and completely outlined the facts and medical evidence in her brief. (Pl.'s Br. at 1-7). The ALJ has also included a detailed recitation of facts in his discussion of claimant's case. (T. 16-25). Rather than reciting this

evidence at the outset, the court will incorporate the facts as summarized by the plaintiff and the ALJ, and will discuss the relevant details below, as necessary to address the issues.

## IV. **APPLICABLE LAW**

### A. **Disability Standard**

An individual under the age of eighteen is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i). *See Hudson v. Astrue*, 1:06-CV-1342 (LEK/VEB), 2009 WL 1212114, at *3-4 (N.D.N.Y. Apr. 30, 2009) (discussing the standard for children's disability benefits). However, the definition provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity. . . ." 42 U.S.C. § 1382c(a)(3) (C)(ii).

The agency has developed a three-step process to be employed in determining whether a child can meet the statutory definition of disability. 20 C.F.R. § 416.924; *Kittles v. Barnhart*, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003); *Ramos v. Barnhart*, 02 Civ. 3127, 2003 WL 21032012, at *7 (S.D.N.Y. May 6, 2003). The first step of the test requires a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b); *Kittles*, 245 F. Supp. 2d at 488. If so, then by statute and by regulation, the child is ineligible for SSI benefits. 42 U.S.C. § 1382c(a)(3) (C)(ii); 20 C.F.R. § 416.924(b).

If the child has not engaged in substantial gainful activity, the second step of the test requires examination of whether he or she suffers from one or more medically determinable impairments that, either alone or in combination, are properly regarded as "severe," in that they cause more than a minimal functional limitation. 20 C.F.R. § 416.924(c); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If the child is found to have a severe impairment, the Commissioner must then determine, at the third step, whether the impairment meets or equals a presumptively disabling condition identified in the listing of impairments set forth in 20 C.F.R. Pt. 404, Subpt. P., App. 1. *Id*. Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); *Kittles*, 245 F. Supp. 2d at 488; *Ramos*, 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed impairment, and the twelve-month durational requirement is satisfied, the claimant will be found to be disabled. 20 C.F.R. § 416.924(d)(1); *Ramos*, 2003 WL 21032012, at *8.

"Functional" equivalence must be examined only if it is determined that the claimant's impairment does not meet or medically equal the criteria for a listed impairment. Analysis of functionality involves considering how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos*, 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating

objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. §
416.926a(b)(1).

Functional equivalence is established by finding an "extreme" limitation,
meaning "more than marked," in a single domain.  20 C.F.R. § 416.926a(a); *Ramos*,
2003 WL 21032012, at *8.  An "extreme limitation" is an impairment which "interferes
very seriously with [the claimant's] ability to independently initiate, sustain, or
complete activities."  20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

Alternatively, a finding of disability is warranted if a "marked" limitation is found
in any two of the listed domains.  20 C.F.R. § 416.926a(a); *Ramos*, 2003 WL 21032012,
at *8.  A "marked limitation" exists when the impairment "interferes seriously with [the
claimant's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §
416.926a(e)(2)(i).  "A marked limitation may arise when several activities or functions
are impaired, or even when only one is impaired, as long as the degree of limitation is
such as to interfere seriously with the ability to function (based upon age-appropriate
expectations) independently, appropriately, effectively, and on a sustained basis."  20
C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine
whether the correct legal standards were applied and whether substantial evidence
supported the decision.  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting
*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *Brault v. Soc. Sec. Admin,
Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  A reviewing court

may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id.* *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly

to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot

"'pick and choose' evidence in the record that supports his conclusions."  *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## V.    THE ALJ'S DECISION

As the first step in his analysis, the ALJ found that O.E.H. had not engaged in substantial gainful activity since the application date.  (T. 14).  Next, the ALJ determined that O.E.H. had the following severe impairments: attention deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD").  (*Id.*)  At the third step, the ALJ found that O.E.H. did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (T. 15).  The ALJ continued his analysis, and found that O.E.H. did not have an impairment or combination of impairments that functionally equaled the severity of a listed impairment under the regulations.  (T. 15-16).

In making his functional equivalence determination, the ALJ considered "all of the relevant evidence in the case record," including objective medical evidence and information from other sources such as school teachers and family members.  (T. 15). Based upon his review of the evidence, the ALJ found that O.E.H. had no limitation in moving about and manipulating objects; less than marked limitation in acquiring and using information, attending and completing tasks, caring for himself, and health and physical well-being; and marked limitation in interacting and relating with others.  (T. 17-25).

The ALJ also evaluated plaintiff's hearing testimony, concluding that plaintiff's statements about the intensity, persistence and limiting effects of O.E.H.'s impairments were not entirely consistent with the record evidence. (T. 16). Because O.E.H. did not have a "marked" limitation in two or more of the functional domains, and did not have an "extreme" limitation in any one domain, the ALJ concluded that O.E.H. was not disabled from the date of the application for benefits. (T. 25).

## DISCUSSION

## VI. <u>WEIGHT OF THE EVIDENCE/DUTY TO DEVELOP RECORD</u>

### A.    Legal Standards

#### 1.    Weight of the Evidence

The ALJ must "evaluate every medical opinion [he] receives, regardless of its source." *Bryant ex rel M.K.* v. *Comm'r of Soc. Sec.*, No. 17-CV-6662, 2019 WL 403398, at *2 (W.D.N.Y. Jan 31, 2019) (citing *Pena v. Chater*, 968 F. Supp. 930, 937 (S.D.N.Y. 1997), *aff'd*, 141 F.3d 1152 (2d Cir. 1998) (citation omitted)); see also 20 C.F.R. § 416.927(c). "Unless a treating source's opinion is given controlling weight, the ALJ considers several factors to decide how much weight to give to a medical opinion," including (1) whether the source examined the claimant; (2) the length, nature, and extent of the treatment relationship; (3) whether the source presented relevant evidence to support the opinion; (4) whether the opinion is consistent with the record as a whole; (5) whether a specialist rendered the opinion in his or her area of expertise; and (6) other factors that tend to support or contradict the opinion. *Id.* § 416.927(c)(1)-(6).    The ALJ does not have to apply every factor, but he must sufficiently explain his reasoning

behind the weight given to the medical opinions. *Id.*

The Commissioner will consider evidence from "other sources" to show the "severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work." *Crouch ex rel. K.C. v. Astrue,* No. 5:11-820 (LEK/ESH), 2012 WL 6948676, at *3 (N.D.N.Y. Dec. 31, 2012) (citing 20 C.F.R. §§ 404.1513(e), 416.913(e)). Nurse practitioners, teachers, and social workers are considered "other sources." Opinions from "other sources" can be "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06–03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006). While their opinions cannot "establish the existence of a medically determinable impairment," they may be used as a means of providing insight into a child's degree of impairment and functional ability. *Id*. at *2 (citing 20 C.F.R. § 416.913(d)).

## 2.  Duty to Develop the Record

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, regardless of whether the claimant is represented by counsel, to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §§ 404.1512 (d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). When a claimant is pro se, however, "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Estrada v.*

*Comm'r of Soc. Sec.*, No. 13-CV-04278, 2014 WL 3819080, at *3 (S.D.N.Y. June 25, 2014) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir.1990)); *see also Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) ("The duty of the ALJ, unlike that of a judge at trial, is to investigate and develop the facts and develop the arguments both for and against the granting of benefits."). "This entails a heightened obligation to ensure both the completeness and the fairness of the administrative hearing." *Id.* (citing *Cullinane v. Sec. of Dep't of Health and Human Services of U.S.*, 728 F.2d 137, 137 (2d Cir. 1984)(describing an ALJ's "affirmative duty to ensure that pro se disability insurance benefit claimants receive full and fair hearings")). Moreover, "[t]he ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment." *Tammy H. v. Comm'r of Soc. Sec.*, No. 5:18-CV-851(ATB), 2019 WL 4142639, at *10 (N.D.N.Y. Aug. 30, 2019) (quoting *Champion v. Berryhill,* No. 16-CV-4723, 2017 WL 4404473, at *16 (S.D.N.Y. Sept. 14, 2017) (other citations omitted)).

In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[3] Although the ALJ must attempt

---

[3] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The current regulations apply to plaintiff's case. *See Jimenez v. Astrue*, No. 12 Civ. 3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that even though the regulations were amended to remove the provision requiring the ALJ to recontact a treating physician to resolve an ambiguity in the record, the regulations still "contemplate the ALJ recontacting the treating physicians when 'the additional information needed is directly related to that source's medical opinion'").

to fill in any clear gaps in the administrative record, "where the record evidence is sufficient for the ALJ to make a disability determination, the ALJ is not obligated to seek further medical records." *Jaeger-Feathers v. Berryhill*, No. 1:17-CV-06350, 2019 WL 666949, at *3 (W.D.N.Y. Feb. 19, 2019) (quoting *Johnson v. Comm'r of Soc. Sec.*, No. 1:17-CV-06350, 2018 WL 1428251, at *5 (W.D.N.Y. Mar. 22, 2018)).

## B. Analysis

Plaintiff argues that the ALJ failed to fully develop the record with O.E.H.'s relevant school and medical records, in contravention of his duty to explore all relevant facts. Plaintiff further argues that the ALJ improperly weighed the medical evidence that was before him, and erred in adopting the opinions of a non-examining state agency psychologist and one-time consultative examiner over that of E.O.H.'s treatment providers. The court agrees that remand is warranted, in light of both the ALJ's failure to sufficiently develop the record and his deficient evaluation of the opinion evidence before him.

O.E.H. was examined by consultative psychologist Katherine Warden, Ph.D. on October 29, 2015, at the request of the ALJ. (T. 289-93). Dr. Warden noted that O.E.H. was in the sixth grade and receiving "85s to 100s" in his classes, however he was only required to complete work at a third grade level. (T. 289). Dr. Warden further indicated that O.E.H. was attending counseling once a week, and pursuing psychiatric treatment. (*Id.*). O.E.H. reported general behavior symptoms including losing his temper easily, arguing with adults, actively defying or refusing to comply with requests, aggression, lying, deliberate destructiveness, stealing, temper tantrums, and self harming. (T. 289-

90). O.E.H. further reported difficulty with concentration and hyperactivity symptoms. (T. 290). Upon examination, Dr. Warden noted that O.E.H. was cooperative, and his "manner of relating, social skills, and overall presentation was age appropriate." (*Id.*). O.E.H. presented with appropriate eye contact and age appropriate language skills. (T. 291). His thought processes were coherent and goal directed, with restricted affect and neutral mood. (*Id.*). Dr. Warden further noted that O.E.H.'s attention, concentration, and memory skills were impaired due to possible cognitive deficits. (*Id.*). Claimant's cognitive functioning was estimated to be below average to borderline. (*Id.*).

Based on her examination, Dr. Warden opined that O.E.H. had no limitation to "learn in accordance to cognitive functioning, ask questions and request assistance in an age-appropriate manner, and be aware of danger and take needed precaution." (T. 292). She found O.E.H. to have a mild limitation in responding appropriately to changes in the environment. (*Id.*). She further opined that O.E.H. was moderately limited in attending to, following, and understanding age appropriate directions; completing age appropriate tasks, and interacting adequately with adults. (*Id.*). Last, Dr. Warden found O.E.H. to be markedly limited in adequately maintaining appropriate social behavior and interacting adequately with peers. (*Id.*). Dr. Warden concluded that the results of O.E.H.'s examination were consistent with psychiatric and cognitive problems, which may significantly interfere with his ability to function on a daily basis. (*Id.*).

In November 2015, state agency physician[4] Jennifer Meyer, M.D. opined that O.E.H. had a "less than marked" limitation in all six functional domains. (T. 100-01).

---

[4]The record reflects that Dr. Meyer's speciality is "pediatrics"; however it is unclear if she maintained any specialty in the field of mental health. (T. 101).

Dr. Meyer purported to rely on and afford "great weight" to Dr. Warden's opinion in developing her own conclusion that O.E.H. was not disabled, despite some clear inconsistencies between the two opinions. (T. 101). Dr. Meyer's opinion is furthermore internally inconsistent, as the evidence which she cited and relied upon did not support her less restrictive limitations.[5]

In October 2017, at the request of the ALJ, nurse practitioner ("NP") Lee Thompson and licensed clinical social worker Joshua Burgess prepared and co-signed a Childhood Disability Evaluation Form on behalf of O.E.H. (T. 370-75). O.E.H. received mental health treatment at Community Health & Behavior Services ("CHBS") from NP Thompson, who managed his psychiatric medication regimen, as well as from Mr. Burgess. In the form, NP Thompson and Mr. Burgess concluded that O.E.H. "functionally equals the listings," determining that his impairments resulted in marked limitations in at least two domains. (T. 370, 373). Specifically, they opined that O.E.H. had a marked limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others. (T. 371). Both NP Thompson and Mr. Burgess supported their findings with various narratives describing O.E.H.'s limitations. (*Id.*).

The ALJ acknowledged each of the aforementioned opinions in his decision, and identified the weight he afforded to each. Specifically, he afforded "limited weight" to

---

[5]For example, in support of her finding that O.E.H. had a "less than marked" limitation in acquiring and using information, Dr. Meyer noted that he was a sixth grader operating at a second and third grade academic level; had an obvious problem with understanding school vocabulary, math comprehension, learning new material, and applying problem-solving skills; and was helped daily to complete assignments. (T. 100).

the opinion by NP Thompson and Mr. Burgess, "because their opinion is not supported by the objective evidence in record . . . including their own treatment notes indicating that the claimant's behavior had improved with treatment." (T. 17). In an effort to illustrate the alleged inconsistencies, the ALJ identified three treatment sessions wherein NP Thompson indicated that O.E.H.'s symptoms were improving. (*Id.*). In the alternative, the ALJ gave "significant weight" to the opinions of Dr. Meyer and Dr. Warden, "because they are mental health specialists, and based on their programmatic expertise." (T. 16).

As a threshold matter, the ALJ erred in failing to develop the record with O.E.H.'s complete mental health treatment history. As plaintiff points out, Mr. Burgess's therapy notes are absent from the record, but for a February 10, 2015 "Treatment Plan (Update)." (T. 261-63). Defendant argues that this record adequately reflects the limited treatment relationship between O.E.H. and Mr. Burgess, however a review of the administrative record in its entirety implies a greater history of treatment. O.E.H.'s mother represented that O.E.H. had received counseling at CHBS from Mr. Burgess, among others, since 2014. (T. 188). At the administrative hearing, O.E.H.'s mother testified that plaintiff was in counseling, in addition to seeing NP Thompson for his medical management. (T. 84). She noted that O.E.H. planned to attend a summer camp with his counselor, Mr. Burgess. (T. 85).

Moreover, the February 2015 *updated* treatment plan implies previous treatment by the nature of the document itself. The updated treatment plain indicates that treatment objectives for O.E.H. were established in February 2013. (T. 262).

Admittedly, Mr. Burgess's contemporaneous notes are slightly confusing, suggesting a history of treatment,[6] while also acknowledging that O.E.H. "has not attended any appointments since his admission appointment. His family has made an appointment for later this month to resume services." (T. 263). Nevertheless, more than seven months later, consultative psychologist Dr. Warden noted that O.E.H. was receiving counseling once a week with Mr. Burgess. (T. 289). Based on the foregoing, the court cannot accept defendant's argument that the February 10, 2015 updated treatment plan represents the entirety of O.E.H.'s treatment history with Mr. Burgess.[7]

The ALJ's deficient development of the record extends beyond Mr. Burgess's records. According to NP Thompson, plaintiff received weekly counseling at school in 2014 and 2015. (T. 302). Despite their obvious relevance to the inquiry before the ALJ, these records are notably absent from the record. Moreover, as plaintiff's counsel points out the ALJ failed to obtain a May 2017 psychological evaluation prepared by school psychologist Barbara Krawiec-Schmalz, Ph.D., in which she analyzed a battery of psychological test results as they related to O.E.H.'s limitations.[8] (T. 35-44).

Because the ALJ failed to completely and fully develop the record as to O.E.H.'s

---

[6]"[O.E.H.] has been consistent with his attendance and participation. He has developed good rapport with the writer and reports that he looks forward to meeting each week." (T. 263).

[7]Defense counsel even admits that, at the very least, the admission record referred to by Mr. Burgess is absent from the record. (Def.'s Br. at 8).

[8]Plaintiff submitted this psychological evaluation, along with various IEPs, report cards, and disciplinary records from between 2014 and 2018 to the Appeals Council for review in December 2017. (T. 35-73). Nevertheless, the Appeals Counsel denied plaintiff's request for review of the ALJ's decision, noting that the new evidence did not show a reasonable probability that it would change the outcome of the decision. (T. 2).

history of mental health treatment, his evaluation of the opinion evidence is consequently flawed. The only support given by the ALJ for his attribution of "limited weight" to the opinion of NP Thompson and Mr. Burgess was its inconsistency with the objective evidence of record, including "their" own treatment notes. (T. 17). The ALJ, however, erred by rejecting their opinion on such basis "without first attempting to fill any clear gaps in the administrative record. *Nuzzo v. Colvin*, No. 12-CV-2373, 2013 WL 2626873, at *2 (E.D.N.Y. June 11, 2013) (quoting *Rosa v. Callahan*, 168 F. 3d 72, 79 (2d Cir. 1999)); *see also Brown v. Comm'r of Soc. Sec.*, No. 13 Civ. 827, 2014 WL 783565, at *17 (S.D.N.Y. Feb. 28, 2014) (citing *Calzada v. Astrue,* 753 F. Supp. 2d 250, 278–79 (S.D.N.Y. Nov. 17, 2010) (pointing to "the record's incompleteness" and "potential omissions in the medical history before the ALJ," and finding that the ALJ had "fail[ed] to address . . . gaps in the record before concluding that the findings of plaintiff's treating physicians were unsupported by the record"). The ALJ should have made reasonable efforts to collect the missing treatment records, and his failure to do so precluded him from relying on any purported inconsistencies as a basis for affording NP Thompson's and Mr. Burgess's opinions limited weight.

Even if this court were to assume that the ALJ's failure to develop the record was harmless error, remand is alternatively warranted due to the ALJ's erroneous basis for attributing limited weight to the opinion of O.E.H.'s treatment providers. As previously discussed, the ALJ cited to inconsistencies between N.P. Thompson's and Mr. Burgess's opinion and treatment records, noting three instances in which O.E.H. was reported to be doing "better" or "improving." (T. 17). The Second Circuit has

cautioned, however, that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is [not disabled]." *Estrella v. Berryhill,* 925 F. 3d 90, 97 (2d Cir. 2019) (citing *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014)). Here, O.E.H.'s treatment records do not reflect a trend of improvement as the ALJ suggests, but instead illustrate the cyclical and inconsistent nature of O.E.H.'s mental health symptoms.

Based on NP Thompson's notes, O.E.H. initially responded well to his therapy and medical regiment, reporting by late 2015 that he was doing better in school, had improved focus, and experienced less impulsivity. (T. 309, 311, 314, 320, 323). However, less than a year after initiating treatment O.E.H. was noted to have increased aggression and impulsivity, having destroyed "several televisions and computers." (T. 326). O.E.H.'s mother corroborated this behavior, testifying that O.E.H. tended to become angry and violent toward others – so much so that his bedroom consisted of only a bed and a night stand, because "he destroy's everything." (T. 84-85, 90). NP Thompson noted that O.E.H. presented as less talkative, with a constricted affect and blank stare. (T. 326). As a result of his regression, O.E.H.'s medications were increased in dosage as well as in kind. (*Id.*). Over the next several months, O.E.H. was noted to be less angry, impulsive and moody. (T. 329, 335). His medication was altered to address reportedly excessive sleeping. (T. 329). Although he continued to break objects when upset, it was noted to happen with less frequency. (T. 335).

Nevertheless, by April 2017 O.E.H. was once again engaging in aggressive and impulsive behavior, and destroying property. (T. 341). O.E.H.'s mother noted that other children were distancing themselves from O.E.H. in light of his behavior. (*Id*.). NP Thompson again altered O.E.H.'s medication to address his symptoms. Despite the same, O.E.H. returned in June 2017 reporting problems in school with managing his anger and otherwise controlling his behavior. (T. 347). It was discussed that O.E.H. may be taken out of his current school setting due to his frequent behavior problems. (*Id*.). O.E.H.'s medications were increased at that time to address his ADHD symptoms and mood stabilization. (*Id*.).

"When viewed alongside the evidence of the apparently cyclical nature of [O.E.H.'s condition]," the ALJ's three "cherry-picked treatment notes" do not provide a sound basis for minimalizing NP Thompson's and Mr. Burgess's opinion. *Estrella v. Berryhill,* 925 F.3d at 97; *see also Tara S. v. Berryhill*, No. 1:17-CV-1371 (DJS), 2019 WL 121243, at *6 (N.D.N.Y. Jan. 7, 2019) ("Cherry picking refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source . . . [and] 'cherry picked' decisions do not satisfy substantial evidence standards because reviewing courts cannot conclude, under such circumstances, that adverse findings were based on evidence reasonable minds might accept as adequate to support a conclusion.") (internal citations and quotations omitted); *Younes v. Colvin,* No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) ("'Cherry picking' can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both.").

Moreover, although NP Thompson's opinion is not entitled to the controlling weight afforded to treating physician's opinions, "the Second Circuit has long recognized that the opinions of a nurse practitioner who regularly treats a claimant is entitled to 'some extra consideration,'" particularly when a claimant is only treated by a nurse practitioner. (*Duell v. Astrue,* No. 8:08-CV-969 (DNH/VEB), 2010 WL 87298, at *6 (N.D.N.Y. Jan. 5, 2010) (quoting *Mongeur v. Heckler,* 722 F.2d at 1039 n. 2). "[T]he amount of weight to give [other source] opinions [such as nurse practitioners and social workers] is based in part on the examining and treatment relationship, length and frequency of the examinations, the extent of relevant evidence given to support the opinion, and consistency with the record as a whole." *Thomas v. Berryhill,* 337 F. Supp. 3d 235, 241 (W.D.N.Y. Oct. 2, 2018) (citing *Fitzwater v. Berryhill,* No. 1:16-CV-696, 2017 WL 4563899 at *5 (W.D.N.Y. Oct. 13, 2017)). The ALJ should "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ]'s reasoning." *Id.* (citing *Sirris v. Colvin*, No. 15-CV-1003, 2016 WL 6090585 at *3 (W.D.N.Y. Oct. 19, 2016)); *see also* SSR 06-03p, 2006 WL 2329939 at *6).

Alternatively, while the opinion of a non-examining consultant may constitute substantial evidence where consistent with the record as a whole, "[t]he general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisors' assessment of what other doctors find is hardly a basis for competent evaluation without

a personal examination of the claimant." *Soto-Rivera v. Comm'r of Soc. Sec.*, No. 17-CV-6675, 2019 WL 2718236, at *3 (W.D.N.Y. June 28, 2019) (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)); *see also Filocomo v. Chater*, 944 F. Supp. 165, 169 (E.D.N.Y. 1996) ("The conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").  In the same vein, the Second Circuit has reiterated that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Estrella v. Berryhill,* 925 F.3d at 98 (citing *Selian*, 708 F.3d at 419). "This concern is even more pronounced in the context of mental illness where . . . a one-time snapshot of a claimant's status may not be indicative of [his] longitudinal mental health." *Id.*

Accordingly, the court remands this case to the ALJ with instructions to further develop the record as previously set forth.  Upon receipt of all the relevant records, the ALJ must re-evaluate the record and, if appropriate, conduct a new hearing.  The ALJ should further re-evaluate plaintiff's testimony, and should not reject it as lacking credibility without explaining his reasons for doing so.  Should the ALJ deny benefits upon remand, he must support his findings with substantial evidence consistent with the aforementioned law and administrative guidance.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner IS **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum-Decision and Order, and it is

**ORDERED**, that the Clerk enter judgment for **PLAINTIFF**.

Dated: December 23, 2019

Andrew T. Baxter
U.S. Magistrate Judge